

## Fourth Court of Appeals
### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-23-00473-CR

Joel **PELLOT**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 406th Judicial District Court, Webb County, Texas
Trial Court No. 2023-CRB-000102-D4
Honorable Oscar J. Hale, Jr., Judge Presiding

Opinion by:      Irene Rios, Justice

Sitting:          Irene Rios, Justice
                  Lori I. Valenzuela, Justice
                  Velia J. Meza, Justice

Delivered and Filed: March 19, 2025

AFFIRMED

Appellant Joel Pellot appeals his convictions for murder and tampering with evidence with the intent to interfere with an investigation. *See* TEX. PENAL CODE ANN. §§ 19.01(b), 37.09(a). On appeal, Pellot argues: (1) the evidence is insufficient to prove he intended to commit murder; (2) the trial court erred in denying his motion to suppress; and (3) the trial court erred by denying his request to include a lesser-included offense in the jury charge. We affirm.

## BACKGROUND

In two counts, Pellot was charged with murdering his wife, Maria Eugenia Muñoz, by injecting her with a combination and quantity of lethal drugs and tampering with the physical evidence interfering with the murder investigation. The jury found Pellot guilty on both counts and recommended sentencing Pellot to life for murdering Maria and ten years' confinement for interfering with the murder investigation. The trial court accepted the jury's sentencing recommendation and assessed Pellot's sentence at life for the murder of his wife and ten years' imprisonment for interfering with the murder investigation, to run concurrently. Pellot appeals.

## SUFFICIENCY OF THE EVIDENCE

In Pellot's first issue, he contends the evidence is insufficient to prove that he intended to murder his wife. He does not challenge the sufficiency of any other element regarding his murder conviction. Pellot does not attack the sufficiency of the evidence supporting his conviction for tampering, and we do not address it here.

### A. Standard of Review

When reviewing the sufficiency of the evidence, we determine whether, "'viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Witcher v. State*, 638 S.W.3d 707, 709–10 (Tex. Crim. App. 2022) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We measure the evidence by the elements of the offense as defined by the hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

This standard coincides with the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. The factfinder may and should draw "reasonable inferences" from the

evidence but may not draw conclusions based on "mere speculation." *Hooper v. State*, 214 S.W.3d 9, 15–16 (Tex. Crim. App. 2007).

The factfinder alone judges the credibility of the witnesses and the weight of the evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04; *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). We may not reevaluate the evidence's weight and credibility of the witnesses and substitute our judgment for that of the factfinder. *Braughton*, 569 S.W.3d at 608. Instead, we determine whether the necessary inferences are reasonable based on the cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Id*. We must presume the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Id*.; *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012) (reviewing court must not usurp the jury's role by "substituting its own judgment for that of the jury"). "Although the parties may disagree about the logical inferences that flow from undisputed facts, where there are two permissible views of the evidence, the [factfinder's] choice between them cannot be clearly erroneous." *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) (internal quotation marks omitted).

### B. Applicable Law

A person commits murder if a person (1) intentionally or knowingly causes the death of an individual or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1), (2).

### C. Analysis

Pellot argues the evidence is insufficient to support his murder conviction because the State failed to show "intent" to cause serious bodily injury or "intent" to cause Maria's death. Pellot contends that while circumstantial evidence can sufficiently support a conviction, the

circumstantial evidence in this case was insufficient, and the jury instead based its conviction on his extramarital affair.

Although the trial consisted of eight days of testimony and the record is voluminous, the State's presentation of evidence tended to show: (1) Pellot undisputedly was having an affair for approximately two years before Maria's death; (2) Maria was aware of the affair; (3) the affair made Maria upset because she desired to have a good marriage, and she still loved her husband; (4) Maria was strong in her faith and she had resolved to take control of her life and move forward from the marriage for herself and her children; (5) Pellot, who is a certified registered nurse anesthetist ("CRNA"), had moved out of the marital home, met with Maria under the guise of discussing their marriage, and through a course of events, injected Maria intravenously with a combination and quantity of lethal drugs that caused Maria's death, and (6) Pellot took measures to dispose of certain physical evidence interfering with law enforcement's investigation.

At approximately 1:32 a.m. in the morning, Pellot called 911 stating his wife, Maria, had overdosed on pills at their house and advised the dispatcher she had been depressed. Pellot reported that he had given Maria a full bottle of pills and only two remained, Maria was not breathing, and he started CPR. Laredo Police Department Officer Gregorio De La Cruz arrived first on the scene and took over administering CPR. Pellot repeatedly told Officer De La Cruz that Maria had been depressed; and when asked what Maria took, Pellot answered he thought she took clonazepam and retrieved the bottle from the master bedroom. Paramedics arrived shortly thereafter, and despite performing CPR, soon determined Maria was deceased.

Pellot explained to several witnesses that he had arrived earlier that evening. After a conversation, he and Maria had sexual intercourse and then fell asleep about midnight. Pellot stated he later woke up and took a shower. During his shower Maria complained about a headache, so

Pellot told her to take some of his clonazepam. After showering, Pellot saw Maria asleep on the bed. Later, when he checked on her, Maria was unresponsive. Pellot told the medical examiner's investigator that Maria suffered from anxiety and depression. Pellot also reported Maria used marijuana and THC gummies, and Maria drank daily. According to one of the investigators, Pellot stated he believed Maria committed suicide, and she had voiced suicidal ideations in the past.

Nevertheless, Officer De La Cruz testified that he saw an injection site on Maria's arm and found a needle and needle cap on the stairs as well as an empty syringe wrapper in the master bedroom closet. One of the responding paramedics confirmed his team did not administer anything to Maria intravenously and testified the local fire department did not carry the needle that was found. He stated he had only seen them at hospitals. When further describing what he witnessed upon his arrival, Officer De La Cruz commented that Pellot was not performing CPR correctly, and he acted excited but nervous. While the paramedics worked on Maria, Officer De La Cruz stated Pellot behaved angrily and yelled a profanity. He also stated that although it appeared Pellot was crying, Officer De La Cruz did not see any tears and did not think Pellot's weeping was genuine. Rather, Pellot appeared "disconnected" and not "really trying to help." As a result, Officer De La Cruz began to suspect Maria's death was not caused by an overdose, although he did not convey his suspicions to Pellot.

A forensic toxicologist testified regarding the toxicology tests he performed on Maria's blood and urine collected shortly after her death. The tests revealed the specimens drawn from Maria tested positive for caffeine, ketamine, Versed, Demerol, morphine, lidocaine, Narcan, and propofol. Maria's test results were negative for alcohol, marijuana, and clonazepam.

Chief Medical Examiner for Webb County Dr. Corine Stern performed the autopsy. Dr. Stern's overall opinion stated: "This 31-year-old, Hispanic female, Maria Eugenia Muñoz, died

from mixed drug intoxication, an overdose of anesthetics and other prescription medication. The manner of death is undetermined." Dr. Stern explained during her external examination of Maria, she located a puncture wound in the crook of her right arm. Dr. Stern found no evidence suggesting abuse of intravenous drugs. Because the evidence from the autopsy was not conclusive enough to prove the manner of death between the two manners she considered—homicide and accident—Dr. Stern stated the manner of death was undetermined. Dr. Stern did not consider suicide as a manner of death in Maria's case. She ruled it out very early after conducting her own investigation, including reading Maria's journals and talking to her family. This led Dr. Stern to determine Maria likely did not cause the puncture wound herself. Specifically, Maria's puncture wound was from a large bore needle used when administering drugs from an intravenous sack. Maria was right-handed and the puncture wound was on her right arm. According to Dr. Stern, it would be difficult for Maria to start an IV on herself, especially with the non-dominant hand. When asked whether Maria's stomach contained any evidence she ingested oral medications, Dr. Stern stated she did not analyze Maria's stomach contents. However, after allowing Maria's stomach contents to settle, Dr. Stern found no evidence of pill residue.

The medical examiner's investigator also saw the needle site on Maria's right inner arm near her elbow prompting the investigator to look for drug paraphernalia in the house. In the master bedroom and its adjacent bathroom, the investigator discovered "packaged needles, tourniquet kits, . . . vials of medications and also pill medication[.]" Surgical supplies, like syringes and tourniquets, were in Pellot's black bag in the bathroom. Additionally, multiple vials of medicine were also found in Pellot's bag in the bathroom. The investigator testified the supplies she found are not normally kept at a residence, and the medicines found are usually not prescribed directly

to patients; rather, they are injectable medications administered by a doctor or through an IV. The investigator did not locate any suicide notes.

Dr. John Huntsinger, the head of anesthesiology at a Laredo hospital, also reviewed Maria's toxicology report. According to Dr. Huntsinger, Maria had an overdose amount of morphine and the highest level of propofol he had ever seen.

CRNA Tina Dores, who knew Pellot, explained the various types of anesthesia and the processes in administering anesthesia, including monitoring heart rate, blood pressure, and blood oxygen levels as well as using a ventilator and breathing tube to provide breathing for a patient because a patient can have no airway reflexes while under anesthesia. Dores then testified regarding the different properties and administration methods of anesthetic drugs such as Versed, ketamine, lidocaine, Demerol, and propofol. The only way to administer propofol is intravenously, and because it almost always causes low blood pressure and apnea (not breathing), patients require breathing support and medication to increase blood pressure. When asked if a person could inject themselves with propofol, Dores stated a person could possibly inject themselves, but the person would fall asleep and become unconscious while doing it. Dores added there would be no purpose to administer propofol to someone affected by morphine and ketamine. And the medications found in Maria's body would cause a patient receiving those medications to stop breathing and have a low heart rate and blood pressure. If nothing is done to support the patient's breathing, airway, blood pressure, and heart rate, the patient will suffer respiratory arrest and ultimately go into cardiac arrest.

Neither sperm nor Pellot's DNA was detected in test samples of evidence collected from vaginal swabs, anal swabs, a blood sample, and saliva samples taken from Maria. The needle cover

and cap found at the scene, however, indicated that both Maria and Pellot were possible contributors to the DNA present on the evidence.

Throughout the investigative process, Pellot's version of events varied slightly. However, he consistently denied he injected Maria or had anything to do with her death. His explanation was that Maria committed suicide. However, the investigation refuted the accounts provided by Pellot.

One of Pellot's coworkers, who was working with Pellot the day before Maria died, saw Pellot in the anesthesia work area grabbing syringes and needles and then from another area grabbing IV starter kits, IV catheters, and IV extension tubing. Pellot placed the items in his personal bag. While Pellot was taking the items and putting them in his bag, the coworker asked if he was getting ready for another surgery or department. Pellot answered no and said he was going home. The coworker described his behavior as appearing rushed and becoming increasingly agitated and rushed as she talked to him. The coworker explained Pellot's actions confused her and made her feel uncomfortable because those were not supplies Pellot would normally need to take home.

Another CRNA who worked with Pellot recalled Pellot getting in trouble for bringing a vial of medicine from another hospital Pellot no longer worked at and for carrying other medications in his personal bag. This CRNA testified he and Pellot were friends, and Pellot confided in him about his marital problems and his extramarital affair. Pellot also shared his concerns about child support if he were to divorce Maria.

Family and close friends who testified agreed that in the months before her death, Maria experienced great sadness concerning her marital problems, specifically that Pellot was having an affair and had moved out of the family home and moved in with his paramour. According to the

family and friends, Maria desired for her marriage with Pellot to work. This desire was echoed in her journals.

A couple of days before her death, Maria and a close friend drove to Pellot's paramour's house to attempt to explain to her that Maria wanted to make her marriage work. Pellot's paramour called the police. Before the police arrived, Pellot, who had Maria's car, told Maria to get into the car with him. Pellot then drove Maria to a park, where he screamed at Maria and busted the windshield of her car.

Maria's friends were aware that she drank alcohol; however, they did not think she had a drinking problem and was unaware she abused drugs. Maria's journals however suggested she thought she drank too much and did not want to depend on alcohol and pills to cope with her issues. Maria had also posted a suicide awareness meme on her social media account, and a friend read a letter to the jury that Maria wrote to her deceased mother discussing Maria's depression and suicidal thoughts while referring to Maria's mother's apparent suicide attempts.

These same witnesses also testified that Maria had begun to speak about becoming more independent, taking control of her life, and valuing herself more. Several of her most recent journal entries and notes throughout her house also reflected the same hopes and showed she was setting boundaries and goals as well. In addition, Maria had made an appointment with a lawyer, was studying to take her Texas nursing exam, and was actively planning a Halloween and birthday party for one of her sons. One of Maria's closest friends whom she spoke with daily stated Maria had never expressed suicidal thoughts.

Additionally, several discrepancies existed between Pellot's account and the police's investigation. Sergeant Luis Mata of the Laredo Police Department testified about his investigation into Maria's death. Sergeant Mata had pictures taken of the shower because he noticed no

condensation, dripping water, or other evidence that Pellot took a shower. Other pictures were taken of the bed to show it was only messed up where Pellot claims Maria was laying when he found her unresponsive, yet he claimed they had sex. Maria's journals and other personal items were also found in the bedside table on the opposite side of where the bed was unkempt. Moreover, Sergeant Mata directed pictures be taken around the bed to depict the ample flat space where Pellot could have moved Maria to perform CPR rather than outside the bedroom in the loft, a suspicious fact that was also noted by Officer De La Cruz. Pellot's medical records indicated he took clonazepam on a regular basis and repeatedly called for refills. In contrast, Maria's medical records indicated clonazepam had been prescribed but not refilled.

After obtaining consent from Pellot to search the house, Sergeant Mata recovered Maria's and Pellot's cell phones and extracted data from them. Messages were recovered but evidence revealed an attempt to erase Maria's iCloud data and cell phone data. The extraction from Pellot's cell phone showed that two days before Maria's death, she sent him a message indicating she accepted his decision not to work on their marriage, and that Maria wanted to move forward. The phone records also showed Maria suggesting they could use the same lawyer for the divorce, and Pellot agreed they could proceed with "minimal lawyer intervention." A screen shot of one of Pellot's emails to Maria, written the day after Maria's message to Pellot discussing divorce, confessing emotional turmoil, and wanting to sit down with her to have a heart-to-heart conversation was also introduced into evidence.

While looking through the house, Sergeant Mata discovered a home security system in the master bedroom closet but noted it had been disconnected. Pellot told Segreant Mata that the security system was linked to Maria's cell phone number and email address, and she prevented Pellot from having access to the security system. The records indicate the day after Maria died,

Pellot contacted the security system company attempting to change the account out of Maria's name. Pellot activated a new cellular device with Maria's cell phone number to change the account. Sergeant Mata was not able to obtain any security surveillance footage from the extraction of Maria's cell phone because it had been erased. However, the garage door sensor sent alerts to Maria's email, and those alerts were able to be recovered. On the night of Maria's death, the sensor alerted at 9:21 p.m., the time Pellot arrived at Maria's house. The open garage sensor next alerted Maria's email at 1:26 a.m., 1:27 a.m., and 1:28 a.m. Pellot called 911 twice: once at 1:29 a.m. and again around 1:32 a.m.

During one of his interviews, Pellot only admitted to maybe having a human growth hormone at home, stating he had nothing else that would be administered intravenously and no anesthesia medications at home. However, a considerable number of other medications, including those administered during anesthesia, were collected from the home.

Maria's friend, who cared for Maria and Pellot's children after Maria's death, testified that shortly after Maria's death, she saw an "erase pending" notice after looking at the "Find a Phone" application on one of the children's iPads linked to Maria's phone. This friend was also aware that Maria's phone had access to the surveillance camera footage from her house. Another friend took Christmas presents to Maria's children who were with Pellot prior to his arrest. Pellot threatened her if she continued her involvement with the investigation but then messaged her the next day to apologize and gave her a gift card.

Importantly, Lisa,[1] the woman with whom Pellot was having an extramarital affair, testified. Lisa testified pursuant to a proffer agreement with the State. In exchange for immunity from prosecution and an agreement by the State not to release information regarding her

---

[1] We use a pseudonym for Pellot's paramour to protect her identity in accordance with the proffer between her and the State.

involvement with the case without a court order, Lisa testified about her participation and knowledge of the criminal activity related to the murder and tampering of physical evidence. Lisa, a registered nurse, met Pellot at work and began a romantic relationship with him a couple of years before Maria's death. Pellot had lived with Lisa about three to four months before Maria died.

Lisa admitted that she and Pellot both had anesthetic drugs at home and kept them together in her upstairs closet for their personal recreational use. They took these drugs from their respective employers. She claimed they kept Versed, propofol, ketamine, fentanyl, lidocaine, morphine, and Demerol at her house. Lisa said she used Versed recreationally, and Pellot used Versed, ketamine, and morphine recreationally. When these drugs were used, Pellot and Lisa administered them through IV ports on each other and themselves. Being right-handed, Lisa explained when she administered the drugs to herself, she would inject her left arm. The drugs they used require a prescription, and Lisa explained that these drugs were typically used in surgery, intensive care units, and the emergency room. According to Lisa, ketamine is a sedative that she did not administer in the operating room; rather it must be administered by an anesthesiologist. Propofol is also a sedative that only an anesthesiologist administers. Versed, a sedative to help patients relax before surgery, can be administered by nurses. Both morphine and Demerol are pain relievers and can also be administered by nurses.

On the night of Maria's death, Lisa stated she saw Pellot around 8:00 p.m., and he was wearing work scrubs. Pellot left after thirty minutes telling Lisa he picked up an extra work shift overnight before his regular morning shift the next day. She did not see him until the next day after both she and Pellot had been interviewed by the police. Lisa stated that Pellot admitted to removing the IV catheter from Maria before the ambulance arrived and placed it and the medicine vials in his car, then disposed of them. Pellot told Lisa that Maria overdosed, and that he placed a needle

and syringe near Maria to attempt to show why there was an entry port into her skin. Lisa admitted that she expected Pellot to deny any wrongdoing; however, he only kept repeating, "I'm sorry." Lisa also testified Pellot told her, "Everything is going to change once the toxicology report comes out." Previously, Pellot had expressed concerns to Lisa about the amount he would have to pay Maria in child support. Pellot indicated he had a prenuptial agreement with Maria but told Lisa he was unsure as to whether it would be enforceable in Texas because it was signed in Puerto Rico.

Lisa went to Maria's house the day after her death. She asked Pellot to delete any surveillance video of her being at the house because she feared the investigation. Also, Lisa explained she deleted the security footage from her own house for the dates surrounding Maria's death at Pellot's direction. Lisa also threw away the vials of medication she had at her house by wrapping them in a trash bag and throwing them away in a garbage bin away from her house. She threw them away because she was not supposed to have the medication at her house.

Pellot is a CRNA and the one with access to medication generally used in administering anesthesia, including propofol that can only be administered intravenously and usually requires breathing support. Pellot was alone with Maria, who was found with a puncture wound on her right arm with a combination and quantity of lethal anesthetic drugs in her system that Pellot had in his possession. Further, investigators testified some of Pellot's version of events did not make sense. Viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Witcher*, 638 S.W.3d at 709–10; *see also Jackson*, 443 U.S. at 319. The evidence is legally sufficient to support Pellot's murder conviction.

Accordingly, we overrule Pellot's first issue.

**MOTION TO SUPPRESS EVIDENCE**

Pellot contends in his second issue that the trial court erred in denying his motion to suppress his statements made to police the night of his wife's death because he was unlawfully detained.

*A. Standard of Review*

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Lerma v. State*, 543 S.W.3d 184, 189–90 (Tex. Crim. App. 2018). We give almost total deference to the trial court's findings of historical facts supported by the record and to mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007) (citing *Guzman v. State*, 995 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We "review de novo 'mixed questions of law and fact' that do not depend upon credibility and demeanor." *Amador*, 221 S.W.3d at 673 (quoting *Montanez v. State*, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006)); *Guzman*, 995 S.W.2d at 89. Accordingly, we review de novo whether a certain set of historical facts gives rise to reasonable suspicion. *Wade v. State*, 422 S.W.3d 661, 669 (Tex. Crim. App. 2013); *Madden v. State*, 242 S.W.3d 504, 517 (Tex. Crim. App. 2007) (holding that the legal question of whether the totality of circumstances is sufficient to support an officer's reasonable suspicion is reviewed de novo). We consider, in the light most favorable to the trial court's ruling, whether the record supports the trial court's explicit findings. *Miller v. State*, 393 S.W.3d 255, 263 (Tex. Crim. App. 2012).

*B. Applicable Law*

The Fifth Amendment to the United States Constitution commands that no person "shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. The warnings articulated by the United States Supreme Court in *Miranda* were established to safeguard

an uncounseled individual's constitutional privilege against self-incrimination during custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 442–57, 467–79 (1966). The Supreme Court has defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. Unwarned statements obtained from custodial interrogation may not be used as evidence by the State in a criminal proceeding during its case-in-chief. *Id.*

When considering "custody" for *Miranda* purposes, we apply a "reasonable person" standard: "A person is in 'custody' only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest." *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996) (citing *Stansbury v. California*, 511 U.S. 318, 322, 325 (1994)). In our custody inquiry, we must examine all the objective circumstances surrounding the questioning. *Dowthitt*, 931 S.W.2d at 255. The subjective belief of law enforcement officers about whether a person is a suspect does not factor into our custody determination unless an officer's subjective belief was somehow conveyed to the person who was questioned. *Stansbury*, 511 U.S. at 323–25.

Article 38.22 of the Texas Code of Criminal Procedure governs the admissibility of statements made by a defendant during custodial interrogation in a criminal proceeding. TEX. CODE CRIM. PROC. ANN. art. 38.22. As with the *Miranda* warnings, the warnings in section 2(a) of article 38.22 are required for admissibility of an accused's statement only when there is custodial interrogation. TEX. CODE CRIM. PROC. art. 38.22, § 3(a). Our construction of "custody" for purposes of article 38.22 is consistent with the meaning of "custody" for purposes of a *Miranda* review. *Wicker v. State*, 740 S.W.2d 779, 785–86 (Tex. Crim. App. 1987).

At trial, the defendant bears the initial burden of proving that a statement was the product of custodial interrogation:

> The mere filing of a motion to suppress does not thrust a burden on the State to show compliance with *Miranda . . .* warnings *unless* and *until* the defendant proves that the statements he wishes to exclude were the product of custodial interrogation. Thus, the State has no burden at all unless *'the record as a whole clearly establishe[s]* that the defendant's statement was the product of custodial interrogation by an agent for law enforcement. It is the defendant's initial burden to establish those facts on the record.

*Wilkerson v. State*, 173 S.W.3d 521, 532 (Tex. Crim. App. 2005) (quoting *Paez v. State*, 681 S.W.2d 34, 36 (Tex. Crim. App. 1984)).

A trial judge's ultimate custody determination presents a mixed question of law and fact. *Thompson v. Keohane*, 516 U.S. 99, 112–13 (1995). Therefore, as discussed above, we afford almost total deference to a trial judge's ruling when the questions of historical facts turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673 (citing *Guzman*, 955 S.W.2d at 89). Conversely, when the questions of historical facts do not turn on credibility and demeanor, we will review a trial judge's custody determination de novo. *Amador*, 221 S.W.3d at 673 (citing *Montanez*, 195 S.W.3d at 109).

In *Dowthitt*, the Court of Criminal Appeals outlined four general situations that may constitute custody: (1) when the suspect is physically deprived of his freedom of action in any significant way; (2) when a law enforcement officer tells the suspect that he cannot leave; (3) when law enforcement officers create a situation that would lead a reasonable person to believe his freedom of movement has been significantly restricted; and (4) when there is probable cause to arrest, and law enforcement officers do not tell the suspect that he is free to leave. *Dowthitt*, 931 S.W.2d at 255.

For the first three situations, the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention. *Id*. For the fourth situation, the officer's knowledge of probable cause must be manifested to the suspect, and custody is established only if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe he is under restraint to the degree associated with an arrest. *Id*.; *see also Stansbury*, 511 U.S. at 325. An officer's subjective intent to arrest the suspect is irrelevant unless that intent is communicated or otherwise manifested to the suspect. *Dowthitt*, 931 S.W.2d at 254; *see also Stansbury*, 511 U.S. at 324–25 (holding police knowledge or beliefs bear on the custody issue only if they are conveyed to the suspect). To evaluate whether a reasonable person in the suspect's situation would have felt that there was a restraint on his freedom to a degree associated with arrest, the record must establish the circumstances manifested to and experienced by him. *State v. Ortiz*, 382 S.W.3d 367, 373 (Tex. Crim. App. 2012) ("[O]nly the objective circumstances known to the detainee should be considered in deciding what a reasonable person in his position would believe."); *see also Thompson*, 516 U.S. at 113 ("[I]f encountered by a 'reasonable person,' would the identified circumstances add up to custody[?]"); *Berkemer v. McCarty*, 468 U.S. 420, 421–22 (1984) ("[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.").

## C. Analysis

### 1. Applicable Facts to the Motion to Suppress

When testifying about his suspicions that Pellot's explanation of the events surrounding Maria's death did not make sense, Officer De La Cruz stated:

Officer:    So, I was telling the officer to take him to the unit. I believe we have enough right there to detain him. He's not free to go anymore[,] and I wanted to take him to the unit. I'm telling the supervisor this guy needs to go to the police department.

State:     And was he detained that night?

Officer:   Just held. He was detained for—just for questioning.

State:     Regarding the investigation of the death of his wife?

Officer:   Yes.

State:     And was he arrested that night?

Officer:   No, he was not.

Based on this exchange, Pellot moved to suppress any statements he made the night of Maria's death. To support his contention that he was detained, Pellot focuses on De La Cruz's body camera video showing the police took his cell phone and placed it on the kitchen counter. The police also told Pellot he would be placed in the back of a patrol car. Pellot added that after being in the patrol car for some time, the police took him to the police station for questioning. Based on these facts, Pellot argues he was detained and not free to leave the custody of the police. As a result, Pellot contends his custodial statements are inadmissible because he was detained and the police did not properly warn him of his rights.

To support its position that Pellot was not detained when he made the statements he seeks to suppress, the State argues Officer De La Cruz's supervisors stated Pellot "was not going to be detained," and Officer De La Cruz did not discuss anything regarding his suspicions in front of Pellot. Rather, Officer De La Cruz's remarks were made only in the presence of other officers. The State also argued Pellot possessed all the videos and evidence long before trial and did not challenge the statements until Officer De La Cruz testified regarding his recollection of the night.

Furthermore, the State—in contending Pellot was not in custody—asserted police specifically told Pellot he was not a suspect at that time and that he was not under arrest. The State added Pellot was placed in the patrol car for his safety and to preserve the crime scene because

Pellot had moved the bottle of pills and was not obeying orders to stay downstairs and not interfere with the police and paramedics upstairs. The video from the patrol car shows Pellot, at times, beating on the car door, yelling, wailing, and crying.

Sergeant Mata also testified during the suppression hearing. He explained that when he arrived at the scene, Pellot was sitting in the back of a patrol car "hysterical [and] screaming." Initially, Sergeant Mata was told Maria overdosed, and thus there were no suspects, and Pellot was not under arrest. Pellot told Sergeant Mata that Maria had been "super depressed," and anxious, and Pellot gave Maria some of his medication because she ran out of her own. Pellot also told Sergeant Mata after taking a shower, he found Maria unresponsive, and the previously full bottle of medication only contained two pills. At no time did Sergeant Mata indicate Pellot was under arrest, that he had probable cause to arrest Pellot, or that Pellot could not leave. Instead, Sergeant Mata testified he assured Pellot several times he was not under arrest, and when Pellot asked if he could get out of the patrol car and walk around, the police did not prevent him from doing so.

Sergeant Mata explained he was conducting a death investigation, not a criminal investigation. Therefore, Pellot's interview at the police station was standard protocol because Pellot was Maria's next of kin. Sergeant Mata added that Pellot voluntarily went to the police station, and the officers never handcuffed Pellot. Pellot was also told he could go home after questioning, and he did in fact go home after the interview.

The trial court denied Pellot's motion to suppress. The trial court concluded Pellot was not a suspect at the time he made the statements he seeks to suppress because no criminal investigation was taking place at the time. Instead, the police were conducting a death investigation of a possible suicide by overdose and Pellot was not in custody for Fourth Amendment purposes. Additionally,

the trial court found Pellot was not told he would not be able to leave, he was not in handcuffs, he was not forced to give any statements, and he voluntarily went to the police station.

2.   Application of Facts to Applicable Law

Officer De La Cruz's subjective belief that the police had probable cause to detain Pellot is irrelevant. *See Dowthitt*, 931 S.W.2d at 254; *see also Stansbury*, 511 U.S. at 324–25. Although Officer De La Cruz surmised that Pellot's explanation did not make sense when he observed a puncture wound to Maria's arm and located a needle and syringe wrapper, Officer De La Cruz never communicated or manifested his subjective belief to Pellot. *See Dowthitt*, 931 S.W.2d at 254; *see also Stansbury*, 511 U.S. at 324–25.

With respect to Sergeant Mata's involvement with Pellot, Sergeant Mata specifically testified that he was conducting a death investigation, not a criminal investigation. Pellot was told he was not under arrest and that he could get out of the patrol car and walk around. While the police did drive Pellot to the police station where he gave a statement, Pellot was never physically deprived of his freedom in any significant way, never told he could not leave, never handcuffed, and never restricted in his movement to a degree amounting to an arrest. *See Gardner v. State*, 306 S.W.3d 274, 293–94 (Tex. Crim. App. 2009). The police drove him to his home after his statement. Pellot was not restrained in his freedom of movement to a degree associated with a formal arrest, and thus he was not in custody. *See Dowthitt*, 931 S.W.2d at 255; *Nickerson v. State*, 312 S.W.3d 250, 256 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). Therefore, we conclude the trial court did not err in denying Pellot's motion to suppress.

Accordingly, we overrule Pellot's second issue.

**LESSER-INCLUDED OFFENSE**

In Pellot's third and final issue, he contends the trial court erred by refusing to include a jury instruction on a lesser-included offense of deadly conduct. *See* TEX. CODE CRIM. PROC. ANN. art. 37.09.

*A. Standard of Review and Applicable Law*

We review a trial court's refusal to submit a lesser-included-offense instruction for an abuse of discretion. *Chavez v. State*, 666 S.W.3d 772, 776 (Tex. Crim. App. 2023). Determining whether a defendant is entitled to an instruction on a lesser-included offense is a two-step inquiry: Is the requested charge a lesser-included offense of the charged offense; and if so, was the defendant entitled to the instruction based on the evidence admitted at trial? *Rice v. State*, 333 S.W.3d 140, 144 (Tex. Crim. App. 2011). The first step is a question of law that requires us to compare the elements of the two offenses using the facts alleged in the indictment, not the evidence produced at trial. *Id*.; *see also* TEX. CODE CRIM. PROC. ANN. art. 37.09.

"The second step of the lesser-included-offense analysis is to determine if there is some evidence in the record which would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser-included offense." *Rice*, 333 S.W.3d at 145. "[T]he guilty-only requirement is met if there is affirmative evidence of a factual dispute that raises the lesser offense and rebuts or negates other evidence establishing the greater offense." *Chavez*, 666 S.W.3d at 776. Thus, "[t]he evidence must establish the lesser[-]included offense as 'a valid, rational alternative to the charged offense.'" *Rice*, 333 S.W.3d at 145 (quoting *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007)).

"We consider all of the evidence admitted at trial, not just the evidence presented by the defendant." *Goad v. State*, 354 S.W.3d 443, 446 (Tex. Crim. App. 2011). "Anything more than a

scintilla of evidence is sufficient to entitle a defendant to a lesser charge." *Id*. "If there is more than a scintilla of evidence supporting the lesser-included charge, the trial court must include the instruction regardless of whether the supporting evidence is 'strong, weak, unimpeached, or contradicted.'" *Gomez v. State*, 499 S.W.3d 558, 561 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (quoting *Bell v. State*, 693 S.W.2d 434, 442 (Tex. Crim. App. 1985)). However, "[t]here must be some evidence directly germane to the lesser-included offense for the [factfinder] to consider before an instruction on a lesser-included offense is warranted." *Goad*, 354 S.W.3d at 446.

### B. Analysis

#### 1. Is deadly conduct a lesser-included offense of murder?

Under the facts of this case, the parties agree that deadly conduct is a lesser-included offense of murder. *Compare* TEX. PENAL CODE ANN. § 19.02(b)(1), (2), *with* TEX. PENAL CODE ANN. § 22.05(a). Specifically, as charged here, to prove deadly conduct, the evidence would have to show that Pellot acted recklessly; to prove murder, the evidence would have to show that Pellot acted with specific intent. An offense is a lesser-included of a greater offense if the lesser-included differs from the greater "only in the respect that a less culpable mental state suffices to establish its commission." TEX. CODE CRIM. PROC. ANN. art. 37.09(3); *see also Cavazos v. State*, 382 S.W.3d 377, 383 (Tex. Crim. App. 2012). "A reckless *mens rea* is a less culpable state of mind than that of an intentional [or knowing] *mens rea*." *Guzman v. State*, 188 S.W.3d 185, 190 (Tex. Crim. App. 2006). Thus, deadly conduct is a lesser-included offense of murder under the pleading filed in this case. *Id.*; *see also Flores v. State*, 245 S.W.3d 432, 440 (Tex. Crim. App. 2008). The first prong of the test is met.

2. Does the evidence support the lesser-included instruction?

We next "consider whether the evidence shows that if [Pellot] is guilty, he is guilty only of the lesser offense." *Cavazos*, 382 S.W.3d at 382. Thus, there must be affirmative evidence that both raises only deadly conduct and rebuts or negates an element of murder. *See id.* at 385. In this case, therefore, affirmative evidence must exist that shows: (1) Pellot did not intend to seriously harm Maria by injecting her with a combination and quantity of lethal drugs; but instead, (2) while being aware of a substantial and unjustifiable risk that Maria would suffer serious bodily injury or death by the injection of a combination and quantity of lethal drugs, (3) Pellot consciously disregarded that risk, and went ahead and injected Maria with a combination and quantity of lethal drugs. *See* TEX. PENAL CODE ANN. §§ 6.03(c) (defining "recklessly"); 19.02(b)(1), (2); 22.05(a). The evidence must establish the lesser-included offense as "a valid, rational alternative to the charged offense." *Wade v. State*, 663 S.W.3d 175, 181 (Tex. Crim. App. 2022).

Throughout the course of the trial, Pellot presented the defense that Maria abused alcohol and prescription medications, suffered from severe depression, and likely committed suicide. Pellot maintained he did not commit an offense: he consistently contended he did not inject her. Rather, he found Maria unresponsive on the bed and dragged her to the loft to perform life-saving measures not knowing what substances she had taken. At no time did the evidence suggest Pellot recklessly injected Maria.

Pellot argues no witness testified he intended to kill Maria. However, "the evidence raising the lesser offense must be affirmatively in the record." *Ritcherson v. State*, 568 S.W.3d 667, 671 (Tex. Crim. App. 2018). "That is, a defendant is not entitled to a lesser-included offense instruction based on the absence of evidence, and the evidence must be directly germane to the lesser-included offense." *Id.* (internal quotation marks omitted). Here, the absence of evidence of Pellot's intent

to kill Maria is not affirmative evidence supporting the *mens rea* that he recklessly caused her death. *See id.* Moreover, we are not persuaded by Pellot's argument that Officer De La Cruz's initial assessment of the scene supports a rationale that Pellot and Maria were possibly using drugs together because Pellot appeared impaired. Officer De La Cruz quickly changed his initial opinion upon noticing the injection site on Maria's arm, finding the syringe wrapper, and finding the needle cap on the stairs. Therefore, Officer De La Cruz's initial thoughts, which were quickly disavowed, did not serve as any evidence that Pellot acted recklessly by injecting Maria. *See Dixon v. State*, 358 S.W.3d 250, 257 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (cautioning a reviewing court should not view evidence in a vacuum, but rather in context of the entire record).

Absent evidence permitting a jury to rationally find that Pellot merely recklessly injected Maria with lethal drugs, we cannot conclude Pellot was entitled to a jury instruction on the lesser-included offense of deadly conduct. Nothing in the record would support a finding that if Pellot was guilty, he was guilty only of deadly conduct. For these reasons, Pellot has failed to satisfy the second prong of the test.

We conclude the trial court did not abuse its discretion when it denied Pellot's request for a lesser-included-offense instruction on deadly conduct.

Accordingly, Pellot's third issue is overruled.

## CONCLUSION

We affirm the trial court's judgment of conviction.

Irene Rios, Justice

Do not publish.